**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DION ROBINSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-541-WHA** |
| | ) | |
| **DON PARKER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Mayor Don Parker submits this Memorandum in support of his Motion for Summary Judgment.

**I. SUMMARY OF THE UNDISPUTED FACTS**

**A. Introduction**

Dion Robinson filed this lawsuit under 42 U.S.C. § 1981, which prohibits racial discrimination in employment. (See Doc. 1 at 1, ¶ 1.) Robinson is an African American and a former police officer for the Town of Midland City. (See Doc. 1 at 2, ¶ 4.)

The defendant is Don Parker, the Mayor of Midland City. (See Doc. 1 at 2, ¶ 4; Parker aff. at 1, ¶ 1.) Robinson claims Mayor Parker constructively discharged him because he had a sexual relationship with a white female. (See Doc. 1 at 2, ¶¶ 3-4.) That allegation is false, (see Parker aff. at 3, ¶ 17), and Robinson does not have any evidence to support it.

In truth, several people lodged accusations of serious misconduct by Robinson while he worked for Midland City. (See Robinson dep. at 24:18-21.)

Those allegations included bribe-taking, drug-dealing, and sexual misconduct. (See Def.'s Ex. 4 at 5, ¶ 12; Def.'s Ex. 5 at 1, ¶¶ 13-14.)  The Alabama Bureau of Investigation even launched a criminal probe.  (See Robinson dep. at 24:12-15, 59:14-17.)

The Town scheduled a disciplinary hearing to consider the accusations. Robinson hired one lawyer, then another.  (See Robinson dep. at 21:8-10, 21:21-22, 28:13-18.)  When his hearing date arrived, Robinson quit.  (See Robinson dep. at 20:17 to 21:2.)

In short, Robinson chose to resign rather than face a hearing on the charges against him.  (See Robinson dep. at 21:8-13.)  Robinson's allegations against Mayor Parker are unfounded.  (See Parker aff. at 3, ¶ 17.)  Mayor Parker is entitled to a judgment as a matter of law.

## B.  Robinson's Employment at Midland City

Mayor Parker personally interviewed Robinson for the Midland City job. (See Robinson dep. at 49:15-17.)  After the interview, Mayor Parker hired Robinson on October 2, 2003.  (See Robinson dep. at 112:6-7; Parker aff. at 1, ¶ 2.)  Robinson advanced to the rank of Sergeant.  (Parker aff. at 1, ¶ 3.)

On October 14, 2004, Mayor Parker appointed Robinson acting Police Chief.  (See Robinson dep. at 30:14-17.)  Robinson served as acting Chief for approximately six weeks.  (See Robinson dep. at 30:19-20.)  Mayor Parker was unable to name Robinson as the permanent Chief, because the Town Council believed Robinson lacked adequate law enforcement experience.  (See Robinson dep. at 30:9-13, 30:23 to 31:5, 36:7-10.)

The Town named Dexter Hammond as permanent Chief on November 9, 2004. (See Parker aff. at 1, ¶ 3; Hammond aff. at 1, ¶ 2.) Robinson resumed the rank of Sergeant. (See Hammond aff. at 1, ¶ 3.)

## C.  Allegations of Corruption and the Investigation

On Friday, December 10, 2004, Midland City Police Department Inv. Andy Harris arrested Rubin Earl McClendon, Jr. for Possession of Marijuana First Degree. (See Hammond aff. at 1, ¶ 4.) After McClendon's arrest, Inv. Harris informed Chief Hammond that McClendon had made allegations to him that Robinson had been accepting bribes in exchange for helping McClendon and another alleged drug dealer avoid apprehension by law enforcement. (See Hammond aff. at 1, ¶ 5.)

Later in the evening of December 10, 2004, Chief Hammon and Inv. Harris interviewed McClendon at the Dale County Jail in Ozark. (See Hammond aff. at 1, ¶ 6.) McClendon repeated his allegations against Robinson to Chief Hammond. (See Hammond aff. at 1, ¶ 6.)

On Monday, December 13, 2004, Chief Hammond asked the Alabama Bureau of Investigation to investigate McClendon's allegations. (See Hammond aff. at 1, ¶ 7.)

Around that time, Chief Hammond informed Mayor Parker of the complaint against Robinson and of his request for an ABI investigation. (See Parker aff. at 1, ¶ 4.)

While the ABI investigation progressed, Chief Hammond personally investigated additional allegations against Sgt. Robinson. (See Hammond aff.

at 2, ¶ 8.)   His investigation included numerous interviews and the examination of official records. (<u>See</u> Hammond aff. at 2, ¶ 8.)

Chief Hammond also informed Mayor Parker of his own investigation and kept Mayor Parker apprised of its status. (<u>See</u> Parker aff. at 1, ¶ 5.)

On March 1, 2005, Chief Hammond placed Robinson on administrative leave with pay pending the outcome of the ABI investigation. (<u>See</u> Robinson dep. at 16:17-22, 23:30 to 24:1, 52:1-3; Hammond aff. at 2, ¶ 9; Parker aff. at 1, ¶ 6.) Defendant's Exhibit 3 is a true and correct copy of the memorandum by which Chief Hammond informed Robinson of his action. (<u>See</u> Hammond aff. at 2, ¶ 9.)

By March 18, 2005, Chief Hammond believed the evidence warranted disciplinary action against Robinson. (<u>See</u> Hammond aff. at 2, ¶ 10.)

Chief Hammond updated Mayor Parker again on the status of his investigation and requested a disciplinary hearing on Robinson's future employment with the Town. (<u>See</u> Parker aff. at 1, ¶ 7.) Chief Hammond described to Mayor Parker the same events that were later recounted in Defendant's Exhibit 4. (<u>See</u> Parker aff. at 1-2, ¶ 7) Based on Chief Hammond's description of those events, Mayor Parker approved Chief Hammond's request for a disciplinary hearing on the allegations against Robinson. (<u>See</u> Parker aff. at 2, ¶ 7.)

Chief Hammond notified Robinson that he had requested a disciplinary hearing with Mayor Parker and the Town Council to determine Robinson's future employment status. (<u>See</u> Hammond aff. at 2, ¶ 10.) Chief Hammond's

4

written notice to Robinson contained a list of departmental policies that Chief Hammond believed Robinson had violated. (<u>See</u> Hammond aff. at 2, ¶ 10.) Chief Hammond informed Robinson that if he desired a hearing, one would be held on March 30, 2005, at 5:00 p.m., at the Town hall. (<u>See</u> Hammond aff. at 2, ¶ 10; Def.'s Ex. 6.) Defendant's Exhibit 6 is a true and correct copy of this notice. (<u>See</u> Hammond aff. at 2, ¶ 10.)

Robinson hired Daleville attorney Neville Reese.[1] (<u>See</u> Robinson dep. at 21:8-10.)

On March 21, 2005, Attorney Reese requested specific details of the charges against Robinson. (<u>See</u> Hammond aff. at 2, ¶ 11.)

On March 25, 2005, Chief Hammond provided Robinson, through Reese, a six-page document in which he supplied details of the charges. (<u>See</u> Hammond aff. at 2, ¶ 12.) Defendant's Exhibit 4 is a true and correct copy of the document. (<u>See</u> Hammond aff. at 2, ¶ 12.)

Defendant's Exhibit 4, which Chief Hammond signed, detailed the charges against Robinson as follows:

> 1.    You received a letter of suspension from myself on March 1, 2005. In that letter of suspension you were told not to represent yourself as a Midland City Police Officer. Yet, you were at ball games at Dale County High School working security and wearing a badge and a weapon. Also, we have been informed that you were representing yourself as a Napier Field Policeman. This would be in violation of S.O.P. 2.29.15, working off-duty, police related assignments without authorization, and would also be in violation of S.O.P. 2.17, working for another agency or jurisdiction without written approval from the Chief of Police.

---

[1] In June 2005, Robinson switched attorneys and hired Dothan lawyer Kalia Lane. (<u>See</u> Robinson dep. at 21:21-22, 28:13-18.)

2.    On January 20, 2005, drugs were found in a police department cabinet with no lock on it. You had put the drugs in there in a Crown Royal bag. When I counseled you about the proper way to secure evidence you got upset and insubordinate. Midland City has an evidence locker and proper procedures which you failed to follow. This amounts to incompetence in violation of S.O.P. 200-2.29.1 and insubordination under S.O.P. 200-1.11.

3.    On March 21, 2005, when inventorying weapons collected by you I found that on the Wilbert Jackson Case #04120156, there were two weapons taken but only the handgun was listed on the report. The 20 gauge shotgun was not logged on the report at all, but was tagged with the same case number. Also, you tagged another handgun on January 11, 2005, Case #05010131, but no property sheet was ever filled out. This is incompetence under S.O.P. 200-2.29.1.

4.    On February 1, 2005, you were written up for making a $751.90 order (hand sanitizers) to Royal Chemical, Inc. without my permission. You did not have authority to make the order. This order was placed by you on December 22, 2004. When I talked with you on February 1, 2005, you told me two different stories about the order.

*First:* Was that the ex-chief ordered the hand sanitizers every year and he must have had the police department on an automatic shipment and billing system.

*Second:* Was that you ordered the items in November 2004, before I became chief.

You acted without authority to place this order and then you were untruthful. This untruthfulness is in violation of S.O.P. 200-2.29.2 and 2.29.3.

5.    On March 8, 2005, it was reported to me that you made a traffic stop with reference [to] a Frank Brown. (This traffic stop was previous to the date of March 8, 2005.) This Frank Brown made a verbal complaint about 11 DVD's (porn) being taken from him on a traffic stop. There was no offense report nor were the items tagged or an evidence property sheet filled out. I found the DVD's in the police department. The items should not have been taken since they were not illegal. On March 16, 2005, the items were released back to Mr. Brown. This would violate the procedures for keeping evidence and violates S.O.P. 200-2.29.1 on

6

incompetence since these items should never have been taken on a traffic stop.

6.    On March 16, 2005, I went to release a weapon (hand gun) back to James Frank by order of Judge Matthews.  You had put the weapon in the administrative office.  You had also put three more handguns and one shotgun in the office and were all tagged, but the one handgun and the shotgun had no property evidence sheet with the items.  This violates the chain of custody and is incompetence under S.O.P. 200-2.29.1.

7.    On February 13, 2005, I received a complaint from Ann at the Red Owl Restaurant with reference [to] you.  Ann stated that you came in the restaurant while you were on duty with the ex-employee at or around noontime when the restaurant was packed with customers.  The ex-employee was there to try and collect money that she claimed was owed to her.  The people at the Red Owl Restaurant were upset at a police officer being there and that this was not a police matter.  It is not proper for a police officer to get involved in a civil matter.  This is incompetence under S.O.P. 200-2.29.1.

8.    On February 16, 2005, I attempted to talk with you about your work performance as a police officer.  Your response was that you wouldn't talk to me about it.  You became very upset and refused to talk with me.  This was insubordination under S.O.P. 200-1.11.

9.    On February 25, 2005, I was out of town and I checked in with the Town.  I was informed that on that date you were in the process of [issuing] a UTC to a driver (Kevin Lamberth) [for] having an expired driver's license.  I asked the dispatcher for the expiration date on the driver's license and she stated that it was January 5, 2005.  The ticket should have never been issued since by law there is a 60 day grace period.  This is incompetence under S.O.P. 200-2.29.1.

10.    On March 9, 2005, the manager of Wings and Things came to the police department to complain about an attempted burglary at his store that had happened at approximately 3:38 A.M. on February 23rd or 24th of 2005.  He stated that you had come out and found the alarm wires cut.  You did not file a report nor did you tell C.I.D. or notify anybody.  This is incompetence under S.O.P. 200-2.29.1.

11.    On March 16, 2005, a person named Creel wanted to talk with me.  He told me he was arrested in August, 2004, for D.U.I., but not put in jail.  He tested a .07 on the Drager.  Mr. Creel stated that you took him from Midland City and left him at the Toy Box in Newton.  You never took him to jail.  This is in violation of all procedures and could have placed the Town in jeopardy if this individual had gotten in an accident.  This is in violation of S.O.P. 200-2.29.1 on incompetence and also S.O.P. 200-2.9 on transporting prisoners to the proper facility.

12.    Sometime around the 4th of July holiday of 2004, an incident occurred with one, Maurice Rumph, who is a known local drug dealer.  When questioned about this by me you told me that you were at a car wash when this individual came up and gave you a high five and left a $100.00 bill in your hand.  You stated that you threw it back at him and said, "What is this for".  When you were questioned about this by the A.B.I. you told them you kept the money for a short time and then went to the individual's apartment and gave the money back to him.  One of these two stories is untrue.  Also, this type of conduct is intolerable.  This will also violate S.O.P. 200-2.29.1 and 2.29.3.

(Def.'s Ex. 4 at 1-5.)

Chief Hammond shared Defendant's Exhibit 4 with Mayor Parker, and Mayor Parker read it.  (See Hammond aff. at 3, ¶ 14; Parker aff. at 2, ¶ 8.)

Robinson's disciplinary hearing was rescheduled several times at the request of Robinson's attorneys.  (See Hammond aff. at 2, ¶ 13; Parker aff. at 3, ¶ 16.)  During the interim, additional allegations of misconduct surfaced.  (See Hammond aff. at 2, ¶ 13.)

In early June 2005, Chief Hammond informed Mayor Parker of the new allegations against Robinson.  (See Hammond aff. at 3, ¶ 14; Parker aff. at 2, ¶ 9.)  On June 8, 2005, Mayor Parker issued an amended notice to inform Robinson of the new allegations.  (See Hammond aff. at 3, ¶ 15; Parker aff. at

2, ¶ 9)  Defendant's Exhibit 5 is a true and correct copy of the amended notice. (See Hammond aff. at 3, ¶ 15; Parker aff. at 2, ¶ 9.)

The allegations in Defendant's Exhibit 5 were based upon information that Chief Hammond provided Mayor Parker as a result of his investigation. (See Hammond aff. at 3, ¶ 15; Parker aff. at 2, ¶ 11.)

Defendant's Exhibit 5 explained the additional charges against Robinson as follows:

> 13.    You gave marijuana and paraphernalia to Kathy Wheeler, Keisha Davis and Tracy Taylor.  This was drugs that you had gotten from Midland City's evidence locker or drugs you had confiscated.   This action is criminal and cannot be tolerated.  Further, this is in violation of S.O.P. 2.29.2.

> 14.    You had a sexual relationship with Keisha Davis, Kathy Wheeler and Tracy Taylor.  This relationship was carried out while you were on duty and even while you were on the Town's patrol car.   You had sexual relations in the Town's patrol car.  Further, you started a sexual relationship with Keisha Davis when she was 17 years of age.  During all of this time you were married.  This violates S.O.P. 2.29.2 and also having sexual relations with a 17 year-old could be considered contributing to the delinquency of a minor, which is criminal conduct.

> 15.    You gave cigarettes and alcohol to Keisha Davis, Kathy Wheeler and Tracy Taylor that you took from people on roadblocks.  This violates S.O.P. 2.29.2 and is also considered to be possible violations of the criminal law.

> 16.    You asked Kathy Wheeler to allow you to sell some controlled substances that she had legally and told her you could get $20.00 a pill and that you and her would divide the profits.  This violates S.O.P. 2.29.2 and is also a possible violation of the criminal laws.

> 17.    While on duty you picked up Kathy Wheeler (while you were having an improper relationship with her) at a club in Dothan, Alabama, on the Town's patrol car and took her home because she had contacted you and said she was too intoxicated to drive.  This violates S.O.P. 2.29.2.

18.    You have consumed alcohol while on duty, in uniform, and were driving a Midland City patrol car.  This violates S.O.P. 2.29.2 and S.O.P. 2.6.  In addition, it is a possible violation of the criminal laws.

(Def.'s Ex. 5 at 1-2.)

In Defendant's Exhibit 5, Mayor Parker informed Robinson that he, personally, would not participate in the final decision on Robinson's future with the Town.  (See Def.'s Ex. 5 at 2; Parker aff. at 2, ¶ 10.)

Mayor Parker did not initiate the investigation or the disciplinary proceedings against Robinson.  (See Hammond aff. at 3, ¶ 16.)  Mayor Parker did not ask or pressure Chief Hammond to investigate Robinson or to seek disciplinary action against him.  (See Hammond aff. at 3, ¶ 16; Parker aff. at 2, ¶ 12.)  Mayor Parker did not direct Chief Hammond's investigation or dictate the outcome.  (See Hammond aff. at 3, ¶ 16; Parker aff. at 2, ¶ 12.)

Chief Hammond made the decision to launch the investigation and to request the disciplinary hearing.  (See Hammond aff. at 3, ¶ 17; Parker aff. at 2, ¶ 13.)  Mayor Parker only agreed to the hearing after Chief Hammond requested it.  (See Hammond aff. at 3, ¶ 17; Parker aff. at 2, ¶ 13.)

It was Mayor Parker's intention for the Town to afford Robinson an impartial hearing on the charges against him.  (See Parker aff. at 3, ¶ 14.)  Again, Mayor Parker had already informed Robinson that he would not participate in the decision.  (See Def.'s Ex. 5 at 2.)

According to Mayor Parker, the Town intended to require sworn testimony on the charges against Robinson, while affording Robinson or his attorney the right to cross-examine all witnesses.  (See Parker aff. at 3, ¶ 15.)

Chief Hammond previously explained that to Robinson in Defendant's Exhibit 4. (See Def.'s Ex. 4 at 1; Parker aff. at 3, ¶ 15.)

Chief Hammond intended to summon witnesses to present live, sworn testimony at the hearing. (See Hammond aff. at 3, ¶ 18.) Based upon his investigation, Chief Hammond believed there was credible evidence to prove all of the charges listed in Defendant's Exhibits 4 and 5. (See Hammond aff. at 3, ¶ 18.)

For the final time, the administrative hearing was rescheduled for June 23, 2005. (See Hammond aff. at 4, ¶ 20; Parker aff. at 3, ¶ 16.) On the day of the hearing, Robinson resigned. (See Robinson dep. at 20:17 to 21:2; Hammond aff. at 4, ¶ 20; Parker aff. at 3, ¶ 16.) The hearing was then cancelled. (See Robinson dep. at 14:23 to 15:14, 41:3-14, Def.'s Ex. 2.)

In his deposition, Robinson admitted that he would have received a due process hearing if he had not chosen to resign. (See Robinson dep. at 25:11 to 26:4, 29:4-6.) Robinson does not dispute that the Town afforded him notice and the opportunity for a hearing. (See Robinson dep. at 26:14 to 28:12.)

Mayor Parker has never taken any action against Robinson that was based upon Robinson's race, or that was based upon the races of the people Robinson allegedly dated. (See Parker aff. at 3, ¶ 17.)

Although Mayor Parker recommended that the Town council terminate Robinson based on the evidence as explained to him by Chief Hammond and as described in Defendant's Exhibits 4 and 5, Mayor Parker did not terminate Robinson on his own. (See Parker aff. at 3, ¶ 18.)

11

Chief Hammond has never heard Mayor Parker make any comments about Robinson's race, or about the races of any people Robinson allegedly dated.  (See Hammond aff. at 3, ¶ 19.)

In his deposition, Robinson testified that he only had one conversation with Mayor Parker about the disciplinary proceedings.  (See Robinson dep. at 23:18-23; 25:6-10.)  Robinson testified that Mayor Parker assured him that he did not have anything to worry about if he had not done anything wrong.  (See Robinson dep. at 23:9-17; 24:22 to 25:5.)  Robinson testified that beyond that, Mayor Parker declined to comment about the proceedings.  (See Robinson dep. at 37:19-22.)

## D.  Racial Composition of the Police Department

The Midland City Police Department had five officers.  (See Robinson dep. at 46:11-13.)  Three were African American – Dion Robinson, Artez Lester, and Jimmy Culbreth.  (See Robinson dep. at 46:14-16, 46:21, 48:14-17, 113:7-14.)

Artez Lester also dated a white female while he worked for Midland City.  (See Robinson dep. at 47:21-23, 113:1; Parker aff. at 3, ¶ 19.)  Like Robinson, Artez Lester also achieved the rank of Sergeant.  (See Robinson dep. at 48:18 to 49:4.)  Artez Lester was later promoted to Lieutenant after Robinson quit, but before this lawsuit was filed.  (See Parker aff. at 3, ¶ 19.)

There is no evidence of racially motivated termination, constructive or otherwise.

## II. <u>ISSUE AND SHORT ANSWER</u>

Is there substantial evidence that Mayor Parker constructively terminated Robinson because of his race? No. There is no evidence that Robinson was subjected to intolerable working conditions, that Mayor Parker created the disciplinary situation in which Robinson found himself, or that Mayor Parker intended to discriminate against Robinson on the basis of race.

## III. <u>ANALYSIS</u>

### A. **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment: "A party against whom a claim … is asserted … may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

According to the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere

13

> allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

## B. Section 1981 Claim

Robinson sues Mayor Parker under 42 U.S.C. § 1981. In pertinent part, it states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (Westlaw 2008).

"[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of

all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (Westlaw 2008).

Section 1981 uses the same requirements of proof and the same analytical framework as Title VII of the Civil Rights Act of 1964. See Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

Robinson alleges Mayor Parker constructively discharged him on account of his race. (See Doc. 1 at 2, ¶ 4.)

### 1. No Intolerable Working Conditions

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (quoting Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)).

"To prove constructive discharge, the employees must demonstrate that their working conditions were so intolerable that a reasonable person in their position would be compelled to resign." Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir. 1989).

"Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987). "[A] constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable." Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).

15

Courts use an objective standard to evaluate constructive discharge claims. "In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions. Rather, we determine whether 'a reasonable person in [the plaintiff's] position would be compelled to resign.'" Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998).

It is undisputed that Robinson resigned from the Town of Midland City in the face of a disciplinary hearing on eighteen counts of official misconduct. (See Def.'s Exs. 4 and 5.) Robinson has not identified any working conditions that were intolerable.

In Fitz v. Pugmire Lincoln-Mercury, Inc., a worker brought suit against his former employer for constructive discharge based on race. 348 F.3d 974 (11th Cir. 2003). The worker alleged that he had learned from co-workers that his employer planned to fire him in the future on account of his race and therefore suffered so much anxiety that he was constructively terminated. Id. at 978.

The United States Court of Appeals for the Eleventh Circuit rejected the worker's claim. Id. at 978. It held, "Even if we assume that the statements of the co-workers were correct, we decline to reach a holding that would encourage speculative litigation and discourage employees and employers from resolving their differences from within the employment relationship." Id.

It is undisputed that Mayor Parker notified Robinson in writing that he would not participate in the decision on Robinson's future employment status.

(See Def.'s Ex. 5 at 2.)  Robinson was represented by two different attorneys. (See Robinson dep. at 21:8-10, 21:21-22, 28:13-18.)  Robinson was informed that he could call witnesses, cross-examine witnesses, and have the assistance of counsel during his hearing.  (See Def.'s Ex. 4 at 1.)

There is no evidence that Robinson faced working conditions so intolerable that a reasonable person, who was not guilty of the charges against him, would feel compelled to resign.

### 2.  No Causation

There is also no evidence that Mayor Parker caused the predicament in which Robinson found himself.  It was Chief Hammond who launched the investigation and originally requested the disciplinary hearing against Robinson.  (See Hammond aff. at 3, ¶ 17; Parker aff. at 2, ¶ 13.)  Mayor Parker only agreed to the hearing after Chief Hammond requested it.  (See Hammond aff. at 3, ¶ 17; Parker aff. at 2, ¶ 13.)

Mayor Parker did not ask or pressure Chief Hammond to investigate Robinson.  (See Hammond aff. at 3, ¶ 16; Parker aff. at 2, ¶ 12.)  Mayor Parker did not ask or pressure Chief Hammond to seek disciplinary action against Robinson.  (See Hammond aff. at 3, ¶ 16; Parker aff. at 2, ¶ 12.)  Mayor Parker did not direct Chief Hammond's investigation or dictate the outcome.  (See Hammond aff. at 3, ¶ 16; Parker aff. at 2, ¶ 12.)

Although Mayor Parker ultimately joined in Chief Hammond's recommendation to terminate Robinson, he only did so in reliance upon the evidence as explained to him by Chief Hammond.  (See Parker aff. at 3, ¶ 18.)

That evidence is recounted in paragraphs 1 through 18 of Defendant's Exhibits 4 and 5.  (See Parker aff. at 3, ¶ 18.)

Once Mayor Parker joined in Chief Hammond's recommendation to terminate Robinson, Mayor Parker notified Robinson that he would not participate in the final decision.  (See Def.'s Ex. 5 at 2; Parker aff. at 2, ¶ 10.)

Mayor Parker did not do anything to create a racially charged working environment so intolerable that no reasonable person could be expected to endure it.

### 3. *No Racial Animus*

Finally, there is no evidence that Mayor Parker intended to discriminate against Robinson on the basis of race.

> To state a claim of race discrimination under § 1981, plaintiffs must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) *that the defendant intended to discriminate on the basis of race;* and (3) that the discrimination concerned one or more of the activities enumerated in the statute.

Jackson v. Bellsouth Telecommunications, 372 F.3d 1250, 1270 (11th Cir. 2004) (emphasis added).

It is undisputed that Mayor Parker never took any action against Robinson that was based upon Robinson's race, or that was based upon the races of the people Robinson allegedly dated.  (See Parker aff. at 3, ¶ 17.)

Chief Hammond presented Mayor Parker with serious allegations of official misconduct by Robinson.  (See Hammond aff. at 3, ¶ 14; Parker aff. at 2, ¶¶ 8-9.)  There is no reason to believe Mayor Parker's decision to allow a hearing on those allegations was motivated by Robinson's race.  There is no

evidence of intentional racial discrimination by Mayor Parker to support Robinson's § 1981 claim.

## IV.  CONCLUSION

For the foregoing reasons, Mayor Parker respectfully moves for summary judgment.

**s/ Steadman S. Shealy, Jr.**
Steadman S. Shealy, Jr.  (SHE023)
Attorney for Defendant Don Parker

OF COUNSEL:

SHEALY, CRUM & PIKE, P.C.
P.O. Box 6346
Dothan, Alabama 36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
E-mail: sshealy@scplaw.us

## CERTIFICATE OF SERVICE

I, Steadman S. Shealy, Jr., certify that on August 29, 2008, I electronically served this document upon:

Malcolm R. Newman
MALCOLM R. NEWMAN, ATTORNEY AT LAW, P.C.
P.O. Box 6137
Dothan, Alabama 36302-6137

**s/ Steadman S. Shealy, Jr.**
Steadman S. Shealy, Jr.

<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     SOUTHERN DIVISION

 4

 5   DION ROBINSON,              )

 6        Plaintiff,            )

 7   VS.                         ) CASE NO. 1:07-cv-541-WHA

 8   DON PARKER,                 )

 9        Defendant.             )

10

11

12

13

14

15           The deposition of DION ROBINSON, taken

16   pursuant to Federal Rules of Civil Procedure

17   before Lisa M. Bryan, Court Reporter and Notary

18   Public, State at Large, at the Law Office of

19   Shealy, Crum & Pike, P.C., 2346 West Main Street,

20   Suite 1, Dothan, Alabama, on the 5th day of June,

21   2008, at approximately 10:00 a.m., pursuant to

22   notice.

23
</pre>

1    Q.    What did you do for them?

2    A.    Forklift operator.

3    Q.    What did you make an hour?

4    A.    $9.50 an hour.

5    Q.    Did you have benefits?

6    A.    Yes, sir.

7    Q.    Did you have benefits at all of these

8    jobs we've been talking about?

9    A.    PSA Transport, no.  I had to get them

10   myself.

11   Q.    And how long did you work for Family

12   Dollar Distribution?

13   A.    July, 2005 until February of 2006.

14   Q.    Why did you leave them?

15   A.    I was spending too much money driving in

16   gas.

17   Q.    Were you living in Dale County and then

18   traveling to Marianna?

19   A.    Yes, sir.

20   Q.    Now, prior to July of '05, where were

21   you working?

22   A.    Midland City.

23   Q.    And when did you stop working at Midland

1   City?

2      A.   June, 2005.

3      Q.   And why did you stop working at Midland

4   City?

5      A.   I resigned, because I was told if I

6   didn't quit they was going to ruin my name.  They

7   was going to publicize everything in the

8   newspaper that I was accused of.

9      Q.   So you resigned; is that correct?

10     A.   Yes, sir.

11     Q.   And what day did you resign?

12     A.   I think it was the 18th.

13     Q.   Of June?

14     A.   Yes.

15     Q.   Now, you were scheduled to have a

16  hearing, a due process hearing?

17     A.   Yes, that's correct.

18     Q.   And what was the date of that hearing?

19     A.   The same day.

20     Q.   So you had been given notice that

21  several different things could happen?  I believe

22  you could be terminated, suspended, or other

23  action taken?

1     A.    I was already suspended.

2     Q.    And then they were going to have a

3  hearing, or you requested a hearing, correct?

4     A.    Uh-huh.

5     Q.    Did you request a hearing?

6     A.    No.  It was -- I was suspended, pending

7  a hearing.

8     Q.    So you didn't request a hearing?

9     A.    No.

10    Q.    Did your lawyer request a hearing?

11    A.    I believe so.

12    Q.    Well, that's you.

13    A.    Yes.

14    Q.    I'm am not trying to say -- but you or

15 your attorney requested a hearing?

16    A.    Correct.

17    Q.    And I believe you were suspended with

18 pay; is that right?

19    A.    Yes.

20    Q.    With pay on March 1 of 2005; is that

21 right?

22    A.    That was the first time, yes.

23    Q.    What do you mean that's the first time?

1    A.    Not on me, I don't.

2    Q.    And what did the letter from the mayor

3    say?

4    A.    I was being suspended, pending a hearing

5    before the council and the mayor.

6    Q.    Now, was your hearing supposed to take

7    place the 23rd day of June of '05?  I'm just

8    looking at a letter from Bob Brogden, a copy of

9    my letter dated June 14th to your lawyer.  Do you

10   know or could you be mistaken?

11   A.    I could be mistaken on the actual date,

12   yes.

13   Q.    So it may not have been June 18th you

14   resigned, it could have been the 23rd day of

15   June?

16   A.    Yes.

17   Q.    And whatever day your hearing was

18   scheduled to hear whether or not you would be

19   suspended -- well, I guess you were already

20   suspended, terminated, or whatever.  You resigned

21   that day; is that correct?

22   A.    I was told if I didn't resign, yes.

23   Q.    I understand.  But, I mean, you resigned

1     whatever day that was?

2        A.    Right.

3        Q.    And if it was the 23rd day of June of

4     2005, then that would have been when.  Is that --

5        A.    Yes.

6        Q.    -- a fair statement?

7        A.    Correct.

8        Q.    Were you prepared on the day of the

9     hearing, of the due process hearing, to present

10    evidence to refute any and all charges?

11       A.    Yes, sir.

12       Q.    And you chose not to?

13       A.    Yes, sir.

14       Q.    Now, let's talk a little bit about --

15    you keep saying that if you did not resign then

16    they were going to -- who is they?  I mean, I

17    know what was going on was between lawyers.

18            Let's see.  At first I think you had

19    Neville Reese?

20       A.    Right.

21       Q.    And then you had a -- is it Kalia Lane?

22       A.    Yes, sir.

23       Q.    But Kalia Lane was the lawyer who was

1    going to present your evidence at the due process

2    hearing; is that right?

3        A.    Right.

4        Q.    And did your lawyer tell you that this

5    is what was going to happen, or how did you know

6    that?

7        A.    It came from the city attorney that --

8        Q.    Oh, you're talking about Bob Brogden?

9        A.    Right.

10       Q.    Speaking to who?

11       A.    Speaking through my attorney.

12       Q.    And what did Bob Brogden say?

13       A.    That if I didn't resign before the

14   hearing that I was going to lose, that everything

15   was going to be published in the newspaper, and I

16   was going to go before a grand jury, and they was

17   going to try to get my certification pulled.

18       Q.    And who told you this information?

19       A.    My attorney, Kalia.

20       Q.    It wasn't spoken to you directly?

21       A.    No, sir.

22       Q.    So you don't really know what was going

23   to happen?  This is something your lawyer came to

1  you and said, Look, I think you need to resign

2  because here is what is going to happen?

3      A.   No, sir.  She gave me -- no.  She told

4  me she was going to let me decide on my own

5  whether we go in there and fight or --

6      Q.   But you chose to resign?

7      A.   Yes, sir, because I knew that if I

8  didn't that they wouldn't leave me alone.

9      Q.   Now, did you ever personally speak with

10  Mayor Parker about any of this?

11     A.   Yes, sir, I did.

12     Q.   Tell me about that.

13     A.   I went in inquiring about why I was

14  being done like this and I didn't like it.  And

15  he told me not to worry about it, because if I

16  haven't did nothing wrong, I don't have anything

17  to worry about.

18     Q.   Is that all that was said?

19     A.   That's all that was said.

20     Q.   And it's my understanding, from looking

21  at this documentation, that Chief Hammond is the

22  one who initiated the first suspension; is that

23  right?

1      A.    Correct.

2      Q.    And it was Chief Hammond who conducted

3  an investigation?

4      A.    Chief Hammond told me ABI was conducting

5  the investigation.

6      Q.    Well, I was going to get to that next,

7  but I thought you -- were you aware that Chief

8  Hammond did an internal investigation or not?

9      A.    It was him and his investigator who was

10  calling people in.  And he told me it was all

11  being done through ABI.

12      Q.    But you understood that, during this

13  time period you were being suspended, that you

14  were under an investigation by the ABI?

15      A.    Correct.

16      Q.    That's all I was trying to get to.

17      A.    Okay.

18      Q.    And you understand that there were being

19  some accusations made against you by various

20  citizens who had complaints; is that true?

21      A.    Yes.

22      Q.    Now, you told me that the mayor -- you

23  went to talk to the mayor, and all the mayor told

1   you is that, you know, don't worry about it, if

2   you haven't done anything wrong it will be okay?

3      A.   Yes.

4      Q.   Is that right?

5      A.   Yes.

6      Q.   And that is all you and the mayor ever

7   discussed about your employment?

8      A.   Yes.

9      Q.   And that's Mayor Parker?

10     A.   Yes.

11     Q.   You could have gone forward with your

12   due process hearing and you chose not to?

13     A.   Correct.

14     Q.   Is that --

15     A.   Yes.

16     Q.   -- true?  Was that on advice of counsel

17   or is that the decision you made?

18     A.   That's the decision I made.

19     Q.   And you could have presented evidence to

20   refute the charges?

21     A.   Correct.  Yes.

22     Q.   And you were prepared to do that?

23     A.   Yes.

1    Q.   And you chose not to?

2    A.   Yes.

3    Q.   And you decided to resign?

4    A.   Yes.

5    Q.   And at the time you resigned, you were

6    just suspended, you were not terminated?

7    A.   Right.

8    Q.   And you were suspended with pay?

9    A.   Yes.

10   Q.   Do you feel like you had complied with

11   all of your due process rights up until the time

12   of the hearing?

13   A.   Yes.

14   Q.   Did you feel like the City of Midland

15   City had complied with all of your due process

16   rights at the time of the hearing?

17   A.   What do you mean?

18   Q.   Well, you had to be given notice of a

19   hearing.  You understand that by law you're given

20   notice, and they had given you notice through

21   your lawyers.  And your lawyers had asked for

22   continuances, and they had given you more time.

23   You know, they were pretty graceful to you.  I

27

1    mean, they kept trying to cooperate with your

2    attorney, who apparently had some issues about

3    having a hearing.  You understand that, don't

4    you?

5        A.    Yes.

6        Q.    And they worked with you on that?

7        A.    Yes, they did.

8        Q.    That's what I was trying to ask you.

9        A.    Yes.

10       Q.    I mean, they were fair about the due

11   process hearing and the process itself.  You may

12   disagree with maybe what was being said, but --

13       A.    Yes.

14       Q.    -- it wasn't that they said, Here,

15   you're going to be here on April.  We don't care

16   whether your lawyer is going to be there or not.

17   He says he can't.  They accommodated you in that

18   regard?

19       A.    Yes.

20       Q.    That's --

21       A.    Okay.

22       Q.    That's the point I was trying to make,

23   was it wasn't like they were rushing you through

1    some hearing.  I think you had three or four

2    different hearing times set, and your attorney

3    kept wanting to put it off so that they could

4    gather more information?

5        A.    Right.

6        Q.    Is that fair?

7        A.    Right.

8        Q.    So we're not here fussing about whether

9    you got notice or didn't get notice, or whether

10   -- that's not an issue in what -- anything about

11   this case.  Is that a fair statement?

12       A.    Fair enough.

13       Q.    Now, at the time of your hearing, your

14   attorney was -- is it Kalia S. Lane?

15       A.    Yes.

16       Q.    367 South St. Andrews Street, Dothan,

17   Alabama?

18       A.    Correct.

19       Q.    Was there a deal worked out between the

20   attorney for the City of Midland City and your

21   attorney?

22       A.    Deal?

23       Q.    Like kind of a bargaining.  I mean, was

1  there a negotiation that, Look, we'll do this if

2  you do this?

3      A.   No, sir.

4      Q.   So you could have gone forward with your

5  hearing if you wanted to?

6      A.   Yes, I could have.

7

8          MR. SHEALY:  Mark this as

9          Defendant's Exhibit 1.

10

11         (Whereupon, Defendant's Exhibit 1

12         was marked for identification

13         and is attached hereto.)

14

15     Q.   Let me show you what I've marked as

16  Defendant's Exhibit 1, which is a copy of your

17  complaint.  Have you ever seen your complaint in

18  this case?

19     A.   You mean what was sent to me?

20

21         MR. NEWMAN:  No, no.

22

23     Q.   No.  It's your lawsuit that you filed

1    against Mayor Parker.

2        A.    Yes, I've seen a copy of it.  Yes, sir.

3        Q.    Let me show it to you.  And I want to

4    ask you, if I can, a couple of questions about

5    it.  You state in your complaint that there were

6    unlawful employment practices.  What evidence do

7    you have that there was unlawful employment

8    practices?

9        A.    The unlawful practices when Mayor Parker

10   appointed me police chief and then came back and

11   told me that I did not have enough experience,

12   per the council, to be the chief, and he was

13   hiring somebody else for that position.

14       Q.    So the mayor appointed you police chief.

15   When was that?

16       A.    I want to say November.

17       Q.    Of '04?

18       A.    Yes, sir.

19       Q.    How long were you police chief?

20       A.    Maybe a month, a month-and-a-half.

21       Q.    And you told me the council decided to

22   not -- to get another police chief?

23       A.    His statement to me was that council

1   said that I did not have enough experience.

2       Q.    So they felt like you were not

3   experienced because you had only been a police

4   officer, what, two years maybe?

5       A.    Three years maybe.

6       Q.    Three years.  Okay.  And you felt like

7   because of your -- they felt like your

8   inexperience, that that was an unlawful

9   employment practice?

10      A.    Well, I don't know what the council

11  thought.  I was only taking the advice of the

12  mayor.

13      Q.    And what else?  What other unlawful

14  employment practices?

15      A.    The mayor kept asking the old chief did

16  I have --

17      Q.    Wait a minute.  Let me ask you, who was

18  the old chief?

19      A.    Charles Knowles.

20      Q.    All right.  Okay.  I'm sorry.

21      A.    Charlie come and asked me did I have a

22  relationship with a certain individual.

23      Q.    And who was that individual?

1    Q.   Bill said, or a rumor was that he was

2    going to be the next chief?

3    A.   Right.

4    Q.   Well, Charlie leaves and then you're the

5    next chief for about a month?

6    A.   Right.

7    Q.   And then the council decides that you

8    may not have enough experience, so they decide to

9    go out and get another chief?

10    A.   Right.

11    Q.   Now, was Bill Camatara ever made chief?

12    A.   No.

13    Q.   So whatever that rumor was, it wasn't

14    true?

15    A.   Bill quit.

16    Q.   So Bill quit.  And went where?

17    A.   I think he went back to Ozark.

18    Q.   Is he still in Ozark?

19    A.   No, sir.

20    Q.   Where is he?

21    A.   He's a DJ for a radio station, the last

22    I heard.

23    Q.   But Bill arrested Melissa?

1       A.    Right.

2       Q.    And you were telling me something about

3    that when he arrested Melissa something happened?

4       A.    Yes.  He was, from my understanding,

5    observing a house party, and she was called to it

6    to take a juvenile home.

7       Q.    And so he decides to arrest her?

8       A.    Yes.

9       Q.    And what happened?

10      A.    He arrested her.  He arrested the

11   juvenile.  And he made the verbal statement

12   during this time that me and her were in a

13   relationship.

14      Q.    Anything else, or does that cover it?

15      A.    That's about it.

16      Q.    Now, is that all of the evidence you

17   have of any unlawful employment practices by

18   Mayor Parker or Midland City?

19      A.    When this hearing first came about, when

20   I was first suspended, I went to Mayor Parker and

21   asked him about it, and Mayor Parker knew of it

22   but he had no comment to it.

23      Q.    Anything else?  Any other evidence?

1    this again.  Okay?

2       A.    Right.

3       Q.    Now, let me show you what I'm going to

4    mark as Defendant's Exhibit Number 2.

5

6                (Whereupon, Defendant's Exhibit 2

7                 was marked for identification

8                 and is attached hereto.)

9

10      Q.    And this was sent to you by Bob Brogden,

11   who is the Town of Midland City attorney handling

12   the hearing process.  Did you get a copy of this?

13      A.    Yes, sir, I did.

14      Q.    And do you agree with that statement?

15      A.    No, sir, I don't.

16      Q.    What do you not agree about it?

17      A.    Because Chief Dexter Hammond took those

18   same charges to the -- what is it called?

19      Q.    Grand jury?

20      A.    Grand jury.

21      Q.    Chief Hammond did that?

22      A.    Yes, sir, he did.

23      Q.    So what you're saying is that -- but all

1    A.    That, too, but the mayor could have also

2    stopped it because he was aware of it.    The mayor

3    controlled the city.

4    Q.    What other evidence do you have?

5    A.    That's all I can think of right now.

6    Q.    All right.    Now, how many -- while you

7    were working at Midland City, how many black

8    police officers were there, or African-American

9    police officers?

10    A.    Three.

11    Q.    And how many total police officers were

12    there?

13    A.    In the beginning, five.

14    Q.    So out of five police officers, how many

15    were African-Americans?

16    A.    Three.

17    Q.    And was that during the time that you

18    were employed there?

19    A.    Yes.    Coming and going, yes.

20    Q.    And who hired those police officers?

21    A.    Well, Artez was already there, so I'm

22    assuming Parker hired him.    But he quit.

23    Q.    So Mayor Parker hired Artes (phonetic),

1    who was African-American?

2        A.    Yes.

3        Q.    Hired you, who was African-American, and

4    hired another police officer who was

5    African-American?

6        A.    Yes.

7        Q.    Is that true?

8        A.    Correct.

9        Q.    Now, when did Artes leave?

10       A.    I'm not sure of the exact date, but he

11   came to work for the City of Dothan.

12       Q.    And was that a little better job?

13       A.    Yes, sir.

14       Q.    Now, was Artes dating --

15

16            MR. NEWMAN:    His name is actually

17       Artez.

18            MR. SHEALY:    Artez.    My bad.    Thank

19       you, Malcolm, for correcting me.

20

21       Q.    Was Artez dating a white female while he

22   was a police officer in Midland City?

23       A.    Yes, he was.

1    Q.   Any issue with that with the mayor?

2    A.   When he left to go to Dothan, Mayor

3    Parker stated that he would not be rehired.

4    Q.   And how do you know that?

5    A.   I verbally heard him say it.

6    Q.   So you heard him make that comment?

7    A.   Yes.

8    Q.   But did he terminate him, or let him go,

9    or institute suspending him, or do anything

10   because he was dating a white lady?

11   A.   Not to my knowledge, no.

12   Q.   And he was dating a white lady, right?

13   A.   Correct.

14   Q.   So you're telling me that three out of

15   the five police officers were African-Americans

16   while you were employed there?

17   A.   Correct.

18   Q.   Now, were any of these officers

19   supervisors or have rank?

20   A.   Artez was a sergeant.

21   Q.   He was a sergeant?

22   A.   He was made sergeant, yes.

23   Q.   He was a sergeant, wasn't he?

1    A.    Yes.

2    Q.    And that's a supervisor, isn't it?

3    A.    That's a supervisor but not head of a

4    department.

5    Q.    But, I mean, that is somebody that has

6    rank and gives supervision and pretty much runs

7    the rest of the officers, true?

8    A.    Well, when the last chief before Charlie

9    came in, it was nobody there but Artez and

10   Anthony Harris.

11   Q.    Who hired you?

12   A.    Charlie Knowles.

13   Q.    Did he interview you?

14   A.    Yes.

15   Q.    Did Mayor Parker have anything to do

16   with your hiring?

17   A.    Mayor Parker did the interview, yes.

18   Q.    Was he there with you -- I mean, at the

19   interview?

20   A.    Charlie -- at which time?  I had one

21   interview with the chief, one interview with

22   Mayor Parker.

23   Q.    Oh, okay.  So you had one interview with

52

1    Q.   Let me show you what I've marked as 3.

2    Is that your March 1 suspension?

3    A.   Yes, sir.

4    Q.   Who signed that document?

5    A.   Chief Dexter Hammond.

6    Q.   Do you see Mayor Parker's name on there

7    at all?

8    A.   No, sir.

9    Q.   Now, what's an SOP?

10   A.   Standard operating procedure?

11   Q.   And were you familiar with the standard

12   operating procedures of a police officer?

13   A.   Yes, sir.

14   Q.   And were you familiar with the standard

15   operating procedures that Midland City had in

16   regard to the conduct of a police officer?

17   A.   Yes, sir.

18   Q.   And are they basically the same for most

19   places?

20   A.   Yes.  Pretty much, yes.

21   Q.   I mean, you're in Ozark now.  Do they

22   have standard operating procedures?

23   A.   Yes.

1  no charges that they had given, that they didn't

2  do an investigation.

3      Q.   How did they talk to ABI?  How did they

4  even know to talk to ABI?

5      A.   Everybody knows to talk to ABI, because

6  it was put out that I was a criminal, per Chief

7  Hammond.

8      Q.   And ABI talked to Daleville.  What

9  happened?

10     A.   They told them that they didn't conduct

11  an investigation.

12     Q.   They did or didn't?

13     A.   They did not.

14     Q.   Well, you know that's a lie.  Well, did

15  the ABI conduct an investigation?

16     A.   To my knowledge, ABI was conducting an

17  investigation.

18     Q.   So somebody didn't tell the truth

19  somewhere, but go ahead.

20     A.   And it was told -- and I was told when I

21  went to work for Daleville that if any of that

22  was found to be true, that I will be terminated.

23     Q.   Were you terminated?

1      Q.   But, I mean, what evidence do you have

2  that it was because you were an African-American?

3      A.   Because there was no way he was going to

4  let me keep that title after he had gave it to me

5  in writing.

6      Q.   But he did hire you, true?

7      A.   Yes, he hired me.

8      Q.   Gave you police chief.  And then

9  apparently the council felt that you didn't have

10  enough experience, but the mayor felt you were

11  fine to be a police chief, true?

12      A.   At the time, acting, yes.

13      Q.   What other evidence do you have that

14  Mayor Parker racially discriminated against you?

15      A.   Right now I can't think of anything

16  else.

17      Q.   And does it really have to do with you

18  being police chief?  Is that kind of your beef?

19      A.   Part of it.

20      Q.   What's the other part?

21      A.   The other part is his attitude, the way

22  he acted towards me once he found out I was

23  dating a white female.  Because when he found out

1  Artez was dating a white female, his attitude

2  changed towards him also.

3       Q.   But he never terminated him or anything,

4  did he?

5       A.   No, he didn't.  He just made it verbal

6  that he wasn't going to rehire Artez about it.

7       Q.   But yet three out of the five police

8  officers working for the City of Midland were

9  African-American?

10      A.   Well, Jimmy Kolbert was also part-time,

11 and he was married to a black female, but he was

12 only part-time.

13      Q.   Is he a white guy?

14      A.   No.  Jimmy Kolbert is a black guy.

15      Q.   Any other evidence?

16      A.   Not that I can think of at this time.

17      Q.   All right.

18

19           MR. SHEALY:  Malcolm, I think I've

20           had enough.  Do you want to ask anything?

21           MR. NEWMAN:  No, not of this

22           witness.

23           MR. SHEALY:  Thank you, Dion.

## AFFIDAVIT OF DEXTER HAMMOND

Having been duly sworn, Dexter Hammond testifies that the following statements are true.

1.    My name is Dexter Hammond.  I am the Chief of Police for the Town of Midland City.  The following statements are based upon my personal knowledge.

2.    I was appointed Police Chief for the Town of Midland City on November 9, 2004.

3.    Dion Robinson had been the Acting Police Chief prior to my appointment.  When I became Chief, Dion Robinson resumed the rank of Sergeant.

4.    On Friday, December 10, 2004, Midland City Police Department Inv. Andy Harris arrested Rubin Earl McClendon, Jr. for Possession of Marijuana First Degree.

5.    After Mr. McClendon's arrest, Inv. Harris informed me that Mr. McClendon had made allegations to him that Sgt. Robinson had been accepting bribes in exchange for helping Mr. McClendon and another alleged drug dealer avoid apprehension by law enforcement.

6.    Later in the evening of December 10, 2004, Inv. Harris and I interviewed Mr. McClendon at the Dale County Jail in Ozark.  Mr. McClendon repeated his allegations against Sgt. Robinson to me.

7.    On Monday, December 13, 2004, I asked the Alabama Bureau of Investigation to investigate Mr. McClendon's claims.

1

8.    While the ABI investigation progressed, I personally investigated additional allegations against Sgt. Robinson.    My investigation included numerous interviews and the examination of official records.

9.    On March 1, 2005, I placed Sgt. Robinson on administrative leave pending the outcome of the investigation.    Defendant's Exhibit 3 is a true and correct copy of the memorandum by which I notified Sgt. Robinson of my action.

10.    By March 18, 2005, I believed the evidence warranted disciplinary action against Sgt. Robinson.    I notified Sgt. Robinson that I had requested a disciplinary hearing with Mayor Don Parker and the Town Council to determine his future employment status.    The written notice contained a list of departmental policies that I believed Sgt. Robinson had violated.    I informed Sgt. Robinson that if he desired a hearing, one would be held on March 30, 2005, at 5:00 P.M., at the Town hall.    A true and correct copy of this notice is attached as Defendant's Exhibit 6.

11.    On March 21, 2005, Sgt. Robinson's attorney, Neville Reese, requested specific details of the charges against Sgt. Robinson.

12.    On March 25, 2005, I provided Sgt. Robinson, through his attorney, a six-page document in which I supplied details of the charges. Defendant's Exhibit 4 is a true and correct copy of this document.

13.    The disciplinary hearing was rescheduled several times at the request of Sgt. Robinson's attorneys.    During the interim, additional allegations of misconduct surfaced.

14.    Throughout this process, I kept Mayor Parker apprised of the course of my investigation.  I shared Defendant's Exhibit 4 with Mayor Parker.  I also informed Mayor Parker of the new allegations against Sgt. Robinson.

15.    On June 8, 2005, Mayor Parker issued an amended notice to inform Sgt. Robinson of the new allegations.  Defendant's Exhibit 5 is a true and correct copy of the amended notice.  The allegations in Defendant's Exhibit 5 were based upon information I provided Mayor Parker as a result of my investigation.

16.    Mayor Parker did not initiate the investigation or disciplinary proceedings against Sgt. Robinson.  He did not ask or pressure me to investigate Sgt. Robinson or to seek disciplinary action against him.  He did not direct my investigation or dictate the outcome.

17.    I made the decision to launch the investigation and to request the disciplinary hearing.  Mayor Parker only agreed to the hearing after I requested it.

18.    Based upon my investigation, I believed there was credible evidence to prove all of the charges listed in Defendant's Exhibits 4 and 5.  I intended to summon witnesses to present live, sworn testimony as to those charges at the hearing.

19.    I have never heard Mayor Parker make any comments about Sgt. Robinson's race, or about the race of any people Sgt. Robinson allegedly dated.

20.    A due process hearing was scheduled for June 23, 2005, on the charges listed in Defendant's Exhibits 4 and 5.  On the day of the hearing, Sgt. Robinson resigned, so the hearing was cancelled.

21.    Further affiant sayeth naught.

Dated: August 29, 2008.

_____
Dexter Hammond

**STATE OF ALABAMA**            )
                                )
**COUNTY OF DALE**              )

Before me, the undersigned Notary Public in and for said State and County, personally appeared Dexter Hammond, who is known to me.  Having been duly sworn, Dexter Hammond testified that the foregoing statements are true based on his personal knowledge.

Dated: August 29, 2008.

[SEAL]

_____
Notary Public

My Commission Expires: _6-9-11_____

 

# *Midland City* *Police Department*

P. O. BOX 69 • MIDLAND CITY, AL 36350
BUSINESS (334) 983-5211 • EMERGENCY (334) 983-1944 • FAX (334) 983-3514

**Dexter Hammond**
Chief

**Don Parker**
Mayor

# M E M O R A N D U M

> **DEFENDANT'S EXHIBIT**
> 3

| | | |
|---|---|---|
| **FROM** | : | Police Chief W. Dexter Hammond |
| **TO** | : | Police Sergeant Dion Robinson |
| **DATE** | : | March 1, 2005 |
| **SUBJECT** | : | **ADMINISTRATIVE LEAVE** |

As voted on by the Town Council and Mayor of the Town of Midland City; Effective **March 1, 2005** at **1900**, you are hereby placed on Administrative Leave (with pay) pending the outcome of the recent investigation being conducted by The Alabama Bureau of Investigation. During this leave period, you are to refrain from representing yourself as a Midland City Law Enforcement Officer and will be required to surrender the following items to the Chief of Police within 24 hours of receipt of this notice.

**EQUIPMENT LIST**
**Police Department Issued Weapons** ~~*Did not Issue.*~~
**Police Department Issued Badge** ✓
**Police Department Assigned Vehicle** ✓
**Police Department Issued Keys** ✓
**Police Department Issued Identification Cards** ✓

*Date received 3/3/05*
*made copy & given to Sgt.*
*Malta*

W. Dexter Hammond
Chief of Police

cc: Personnel File

DEFENDANT'S
EXHIBIT
4

**TO:  DION ROBINSON C/O NEVILLE REESE, ATTORNEY AT LAW**

This is to inform you that I am proposing to terminate your employment with the Town of Midland City, Alabama, and/or suspend you, with or without pay, or demote you.  You have a right to have a hearing before the Mayor and Town Council.  The mayor and Town Council has the right to make the decision on whether or not your employment will be terminated or whether you will be suspended with or without pay, and/or demoted, or whether any action at all will be taken against you.  If you desire a hearing, one will be held at the Town Hall on the 31st day of March, 2005, at 5:00 p.m.  If you do not desire a hearing your employment will be terminated.  You have the right to be represented by legal counsel of your choosing.  The informal rules of administrative hearing will apply.  You have the right to have a court reporter or other recording method to record the entire proceedings, at your own expense.  You will be afforded an opportunity to present witnesses and the right to cross exam any witnesses.  All witnesses will testify under oath.

The specification of the charges to be brought before the Town Council are as follows:

1.  You received a letter of suspension from myself on March 1, 2005.  In that letter of suspension you were told not to represent yourself as a Midland City Police Officer.  Yet, you were at ball games at Dale County High School working security and wearing a badge and a weapon.  Also, we have been informed that you were representing yourself as a Napier Field Policeman. This would be in violation of S.O.P. 2.29.15, working off-duty, police related assignments without authorization, and would also be in violation of S.O.P.

2.17, working for another agency or jurisdiction without written approval from the Chief of Police.

2.  On January 20, 2005, drugs were found in a police department cabinet with no lock on it. You had put the drugs in there in a Crown Royal bag. When I counseled you about the proper way to secure evidence you got upset and insubordinate. Midland City has an evidence locker and proper procedures which you failed to follow. This amounts to incompetence in violation of S.O.P. 200-2.29.1 and insubordination under S.O.P. 200-1.11.

3.  On March 21, 2005, when inventorying weapons collected by you I found that on the Wilbert Jackson Case #04120156, there were two weapons taken but only the handgun was listed on the report. The 20 gauge shotgun was not logged on the report at all, but was tagged with the same case number. Also, you tagged another handgun on January 11, 2005, Case #05010131, but no property sheet was ever filled out. This is incompetence under S.O.P.200-2.29.1.

4.  On February 1, 2005, you were written up for making a $751.90 order (hand sanitizers) to Royal Chemical, Inc. without my permission. You did not have authority to make the order. This order was placed by you on December 22, 2004. When I talked with you on February 1, 2005, you told me two different stories about the order.

    *First:*    Was that the ex-chief ordered the hand sanitizers every year and he must have had the police department on an automatic shipment and billing system.

*Second:* Was that you ordered the items on in November, 2004, before I became chief.

You acted without authority to place this order and then you were untruthful. This untruthfulness is in violation of S.O.P. 200-2.29.2 and 2.29.3.

5. On March 8, 2005, it was reported to me that you made a traffic stop with reference a Frank Brown. (This traffic stop was previous to the date of March 8, 2005). This Frank Brown made a verbal complaint about 11 DVD's (porn) being taken from him on a traffic stop. There was no offense report nor were the items tagged or an evidence property sheet filled out. I found the DVD's in the police department. The items should not have been taken since they were not illegal. On March 16, 2005, the items were released back to Mr. Brown. This would violate the procedures for keeping evidence and violates S.O.P. 200-2.29.1 on incompetence since these items should have never been taken on a traffic stop.

6. On March 16, 2005, I went to release a weapon (hand gun) back to James Frank by order of Judge Matthews. You had put the weapon in the administrative office. You had also put three more handguns and one shotgun in the office and were all tagged, but the one handgun and the shotgun had no property evidence sheet with the items. This violates the chain of custody and is incompetence under S.O.P. 200-2.29.1

7. On February 13, 2005, I received a complaint from Ann at the Red Owl Restaurant with reference you. Ann stated that you came in the restaurant while you were on duty with the ex-employee at or around noontime when

the restaurant was packed with customers. The ex-employee was there to try and collect money that she claimed was owed to her. The people at the Red Owl Restaurant were upset at a police officer being there and that this was not a police matter. It is not proper for a police officer to get involved in a civil matter. This is incompetence under S.O.P. 200-2.29.1.

8.  8.  On February 16, 2005, I attempted to talk with you about your work performance as a police officer. Your response was that you wouldn't talk to me about it. You became very upset and refused to talk with me. This was insubordination under S.O.P. 200-1.11.

9.  On February 25, 2005, I was out of town and I checked in with the Town. I was informed that on that date you were in the process of a UTC to a driver (Kevin Lamberth) by having an expired driver's license. I asked the dispatcher for the expiration date on the driver's license and she stated that it was January 5, 2005. The ticket should have never been issued since by law there is a 60 day grace period. This is incompetence under S.O.P. 200-2.29.1.

10. On March 9, 2005, the manager of Wings and Things came to the police department to complain about an attempted burglary at his store that had happened at approximately 3:38 a.m. on February 23rd or 24th of 2005. He stated that you had come out and found the alarm wires cut. You did not file a report nor did you tell C.I.D. or notify anybody. This is incompetence under S.O.P. 200-2.29.1.

11. On March 16, 2005, a person named Creel wanted to talk with me. He told me he was arrested in August, 2004, for D.U.I, but not put in jail. He tested a

.07 on the Drager. Mr. Creel stated that you took him from Midland City and left him at the Toy Box in Newton. You never took him to jail. This is in violation of all procedures and could have placed the Town in jeopardy if this individual had gotten in an accident. This is in violation of S.O.P. 200-2.29.1 on incompetence and also S.O.P. 200-2.9 on transporting prisoners to the proper facility.

12. Sometime around the 4th of July holiday of 2004, an incident occurred with one, Maurice Rumph, who is a known local drug dealer. When questioned about this by me you told me that you were at a car wash when this individual came up and gave you a high five and left a $100.00 bill in your hand. You stated that you threw it back at him and said, "What is this for". When you were questioned about this by the A.B.I. you told them you kept the money for a short time and then went to the individual's apartment and gave the money back to him. One of these two stories is untrue. Also, this type of conduct is intolerable. This will also violate S.O.P./ 200-2.29.1 and 2.29.3.

You should know that under the Sunshine Laws this hearing will be public except where character and good name is to be discussed. If you want a hearing you should notify the Town Attorney, Robert H. Brogden, in writing that you are requesting a hearing. If the date of the tentative hearing I have set is not available for you or your attorney, you should notify Mr. Brogden immediately so that another hearing can be set. If you do not request a hearing in writing to Robert H. Brogden, the attorney for the Town, it will be presumed that you do not want a hearing and your employment will be terminated.

This the 25th day of March, 2005.

W. Dexter Hammond, Chief of Police
of The Town of Midland City, Alabama



**TO: DION ROBINSON**

## <u>AMENDED NOTICE</u>

This is to inform you that the Notice dated March 25, 2005, is hereby amended as set out herein and also additional specification of charges are set out herein as follows:

13. You gave marijuana and paraphernalia to Kathy Wheeler, Keisha Davis and Tracy Taylor. This was drugs that you had gotten from Midland City's evidence locker or drugs you had confiscated. This action is criminal and cannot be tolerated. Further, this is in violation of S.O.P. 2.29.2.

14. You had a sexual relationship with Keisha Davis, Kathy Wheeler and Tracy Taylor. This relationship was carried out while you were on duty and even while you were on the Town's patrol car. You had sexual relations in the Town's patrol car. Further, you started a sexual relationship with Keisha Davis when she was 17 years of age. During all of this time you were married. This violates S.O.P. 2.29.2 and also having sexual relations with a 17 year old could be considered contributing to the delinquency of a minor, which is criminal conduct.

15. You gave cigarettes and alcohol to Keisha Davis, Kathy Wheeler and Tracy Taylor that you took from people on roadblocks. This violates S.O.P. 2.29.2 and is also considered to be possible violations of the criminal law.

16. You asked Kathy Wheeler to allow you to sell some controlled substances that she had legally and told her you could get $20.00 a pill and that you and her would divide the profits. This violates S.O.P. 2.29.2 and is also a possible violation of the criminal laws.

17. While on duty you picked up Kathy Wheeler (while you were having an improper relationship with her) at a club in Dothan, Alabama, on the Town's patrol car and took her home because she had contacted you and said she was too intoxicated to drive. This violates S.O.P. 2.29.2.

18. You have consumed alcohol while on duty, in uniform, and were driving a Midland City patrol car. This violates S.O.P. 2.29.2 and S.O.P. 2.6. In addition, it is a possible violation of the criminal laws.

This is to inform you that I am proposing to terminate your employment with The Town of Midland City, Alabama. You have the right to a hearing before the Town Council if you notify me in writing within five (5) days from the date you receive this Notice. If I do not receive the written notification of your request for a hearing within five (5) days, you will be terminated effective on the 6th day after you receive this notification. If you request a hearing a special time will be set for the hearing before the Town Council.

All of the things you were told in the Notice dated March 25, 2004, still apply unless they are in conflict with this Notice. I will not sit in decision of this matter because myself and the Chief of Police are the persons bringing these charges.

DONE this _____ day of June, 2005.

Don Parker, Mayor
of The Town of Midland City, Alabama

I, Don Parker, Mayor of the Town  of Midland City, Alabama, have hand delivered the above Amended Notice to Dion Robinson on the _____ day of June, 2005, at _2:45_ o'clock, _P_ .m.

Don Parker, Mayor
of The Town of Midland City, Alabama



# *Midland City* **Police Department**

P. O. BOX 69 • MIDLAND CITY, AL 36350
BUSINESS (334) 983-5211 • EMERGENCY (334) 983-1944 • FAX (334) 983-3514

**Dexter Hammond**
*Chief*

**Don Parker**
*Mayor*

RECEIVED
3/18/2005
@ 1845



March 18, 2005

Sgt. Dion Robinson:

This letter is to inform you that I have requested an Administrative Disciplinary hearing with the mayor and Council to determine your further employment status with the Midland City Police Department. The Charges lodge against you will as follows from your departments Policy and Procedures (SOP); # 200

- 2.29 - Incompetence in the performance of your duties.

- 2.29.15. - Conduct unbecoming of an officer.

- 2.9 – The Safeguarding of prisoners

- 2.29.14 - Chain of Command

- 2.17 – Police Commissions

The meeting will take place on Wednesday March 30, 2005 at City Hall. You may choose to be there at 5:00 pm to argue your case.

Sincerely,

Dexter Hammond *WOr*
Chief Of Police

CC:

Mayor office
Town Clerk
Town Council

## <u>AFFIDAVIT OF DON PARKER</u>

Having been duly sworn, Don Parker testifies that the following statements are true.

1.    My name is Don Parker. I am the Mayor of the Town of Midland City. The following statements are based upon my personal knowledge.

2.    I hired Dion Robinson as a Police Officer for the Town of Midland City on October 2, 2003.

3.    Dion Robinson achieved the rank of Sergeant and later became Acting Chief of Police until the Town hired Dexter Hammond as permanent Chief on November 9, 2004.

4.    In December 2004, Chief Hammond informed me that he had received a complaint that Sgt. Robinson had been accepting bribes in exchange for affording favorable treatment to drug dealers. Chief Hammond said he was asking the Alabama Bureau of Investigation to investigate the allegations.

5.    During the period between December 2004 and March 2005, Chief Hammond informed that he was also investigating allegations of misconduct by Sgt. Robinson. Chief Hammond periodically apprised me of the status of his investigation.

6.    On March 1, 2005, Chief Hammond placed Sgt. Robinson on administrative leave.

7.    On March 18, 2005, Chief Hammond updated me again on the status of his investigation and requested a disciplinary hearing on Sgt. Robinson's future employment with the Town of Midland City. Chief Hammond

1

described the same events that were later recited in Defendant's Exhibit 4. Based on Chief Hammond's description of those events, I approved his request for a disciplinary hearing on the allegations against Sgt. Robinson.

8.    On March 25, 2005, Chief Hammond prepared Defendant's Exhibit 4. Chief Hammond showed me Defendant's Exhibit 4, and I read it.

9.    In June 2005, Chief Hammond informed me of additional allegations of misconduct by Sgt. Robinson that he had uncovered. On June 8, 2005, I issued an amended notice to Sgt. Robinson detailing the additional charges against him. Defendant's Exhibit 5 is a true and correct copy of the amended notice.

10.    In Defendant's Exhibit 5, I informed Sgt. Robinson that I, personally, would not participate in the final decision on his future employment with the Town.

11.    All of the allegations contained in Defendant's Exhibit 5 were based upon information Chief Hammond provided me.

12.    I did not ask or pressure Chief Hammond to investigate Sgt. Robinson or to seek disciplinary action against him. I did not direct Chief Hammond's investigation. I did not instruct or pressure Chief Hammond to reach any pre-determined findings.

13.    Chief Hammond made the decision to initiate the investigation and, later, to request a disciplinary hearing. I only agreed to the hearing after Chief Hammond requested it.

14.    It was my intention that the Town would afford Sgt. Robinson an impartial hearing on the charges against him.

15.    As Chief Hammond explained to Sgt. Robinson in Defendant's Exhibit 4, the Town of Midland City intended to require sworn testimony on the charges against Sgt. Robinson, while affording him, or his attorney, the right to cross-examine all witnesses.

16.    Sgt. Robinson's hearing was postponed several times at the request of his attorneys.  The hearing was finally scheduled for June 23, 2005.  On that day, Sgt. Robinson resigned before the hearing could begin.

17.    I have not taken any action against Sgt. Robinson that was based on his race, or that was based on the races of the people he allegedly dated.

18.    Although I recommended the Town council terminate Sgt. Robinson based on the evidence as explained to me by Chief Hammond and as described in Defendant's Exhibits 4 and 5, I did not terminate Sgt. Robinson on my own.

19.    Sgt. Robinson was not the only African-American officer employed by the Town of Midland City who dated outside his race.  Artez Lester was an African American officer who dated Caucasian women.  Artez Lester was promoted to Sergeant and later was promoted to Lieutenant after Sgt. Robinson quit, but before this lawsuit was filed.  Artez Lester left the Midland City Police Department voluntarily at the rank of Lieutenant to take another job.

20.    Further affiant sayeth naught.

Dated: August 29, 2008.

3

_____
Don Parker

**STATE OF ALABAMA**          )
                             )
**COUNTY OF DALE**            )

Before me, the undersigned Notary Public in and for said State and County, personally appeared Don Parker, who is known to me.  Having been duly sworn, Don Parker testified that the foregoing statements are true based on his personal knowledge.

Dated: August 29, 2008.

[SEAL]

_____
Notary Public

My Commission Expires: ___6-9-11___

DEFENDANT'S
EXHIBIT
4

**TO: DION ROBINSON C/O NEVILLE REESE, ATTORNEY AT LAW**

This is to inform you that I am proposing to terminate your employment with the Town of Midland City, Alabama, and/or suspend you, with or without pay, or demote you. You have a right to have a hearing before the Mayor and Town Council. The mayor and Town Council has the right to make the decision on whether or not your employment will be terminated or whether you will be suspended with or without pay, and/or demoted, or whether any action at all will be taken against you. If you desire a hearing, one will be held at the Town Hall on the 31st day of March, 2005, at 5:00 p.m. If you do not desire a hearing your employment will be terminated. You have the right to be represented by legal counsel of your choosing. The informal rules of administrative hearing will apply. You have the right to have a court reporter or other recording method to record the entire proceedings, at your own expense. You will be afforded an opportunity to present witnesses and the right to cross exam any witnesses. All witnesses will testify under oath.

The specification of the charges to be brought before the Town Council are as follows:

1.  You received a letter of suspension from myself on March 1, 2005. In that letter of suspension you were told not to represent yourself as a Midland City Police Officer. Yet, you were at ball games at Dale County High School working security and wearing a badge and a weapon. Also, we have been informed that you were representing yourself as a Napier Field Policeman. This would be in violation of S.O.P. 2.29.15, working off-duty, police related assignments without authorization, and would also be in violation of S.O.P.

2.17, working for another agency or jurisdiction without written approval from the Chief of Police.

2.  On January 20, 2005, drugs were found in a police department cabinet with no lock on it. You had put the drugs in there in a Crown Royal bag. When I counseled you about the proper way to secure evidence you got upset and insubordinate. Midland City has an evidence locker and proper procedures which you failed to follow. This amounts to incompetence in violation of S.O.P. 200-2.29.1 and insubordination under S.O.P. 200-1.11.

3.  On March 21, 2005, when inventorying weapons collected by you I found that on the Wilbert Jackson Case #04120156, there were two weapons taken but only the handgun was listed on the report. The 20 gauge shotgun was not logged on the report at all, but was tagged with the same case number. Also, you tagged another handgun on January 11, 2005, Case #05010131, but no property sheet was ever filled out. This is incompetence under S.O.P.200-2.29.1.

4.  On February 1, 2005, you were written up for making a $751.90 order (hand sanitizers) to Royal Chemical, Inc. without my permission. You did not have authority to make the order. This order was placed by you on December 22, 2004. When I talked with you on February 1, 2005, you told me two different stories about the order.

    *First:*   Was that the ex-chief ordered the hand sanitizers every year and he must have had the police department on an automatic shipment and billing system.

*Second:*    Was that you ordered the items on in November, 2004, before I became chief.

You acted without authority to place this order and then you were untruthful. This untruthfulness is in violation of S.O.P. 200-2.29-2 and 2.29.3.

5.    On March 8, 2005, it was reported to me that you made a traffic stop with reference a Frank Brown. (This traffic stop was previous to the date of March 8, 2005). This Frank Brown made a verbal complaint about 11 DVD's (porn) being taken from him on a traffic stop. There was no offense report nor were the items tagged or an evidence property sheet filled out. I found the DVD's in the police department. The items should not have been taken since they were not illegal. On March 16, 2005, the items were released back to Mr. Brown. This would violate the procedures for keeping evidence and violates S.O.P. 200-2.29.1 on incompetence since these items should have never been taken on a traffic stop.

6.    On March 16, 2005, I went to release a weapon (hand gun) back to James Frank by order of Judge Matthews. You had put the weapon in the administrative office. You had also put three more handguns and one shotgun in the office and were all tagged, but the one handgun and the shotgun had no property evidence sheet with the items. This violates the chain of custody and is incompetence under S.O.P. 200-2.29.1

7.    On February 13, 2005, I received a complaint from Ann at the Red Owl Restaurant with reference you. Ann stated that you came in the restaurant while you were on duty with the ex-employee at or around noontime when

the restaurant was packed with customers. The ex-employee was there to try and collect money that she claimed was owed to her. The people at the Red Owl Restaurant were upset at a police officer being there and that this was not a police matter. It is not proper for a police officer to get involved in a civil matter. This is incompetence under S.O.P. 200-2.29.1.

8.    8.  On February 16, 2005, I attempted to talk with you about your work performance as a police officer. Your response was that you wouldn't talk to me about it. You became very upset and refused to talk with me. This was insubordination under S.O.P. 200-1.11.

9.    On February 25, 2005, I was out of town and I checked in with the Town. I was informed that on that date you were in the process of a UTC to a driver (Kevin Lamberth) by having an expired driver's license. I asked the dispatcher for the expiration date on the driver's license and she stated that it was January 5, 2005. The ticket should have never been issued since by law there is a 60 day grace period. This is incompetence under S.O.P. 200-2.29.1.

10.   On March 9, 2005, the manager of Wings and Things came to the police department to complain about an attempted burglary at his store that had happened at approximately 3:38 a.m. on February 23rd or 24th of 2005. He stated that you had come out and found the alarm wires cut. You did not file a report nor did you tell C.I.D. or notify anybody. This is incompetence under S.O.P. 200-2.29.1.

11.   On March 16, 2005, a person named Creel wanted to talk with me. He told me he was arrested in August, 2004, for D.U.I, but not put in jail. He tested a

.07 on the Drager. Mr. Creel stated that you took him from Midland City and left him at the Toy Box in Newton. You never took him to jail. This is in violation of all procedures and could have placed the Town in jeopardy if this individual had gotten in an accident. This is in violation of S.O.P. 200-2.29.1 on incompetence and also S.O.P. 200-2.9 on transporting prisoners to the proper facility.

12. Sometime around the 4th of July holiday of 2004, an incident occurred with one, Maurice Rumph, who is a known local drug dealer. When questioned about this by me you told me that you were at a car wash when this individual came up and gave you a high five and left a $100.00 bill in your hand. You stated that you threw it back at him and said, "What is this for". When you were questioned about this by the A.B.I. you told them you kept the money for a short time and then went to the individual's apartment and gave the money back to him. One of these two stories is untrue. Also, this type of conduct is intolerable. This will also violate S.O.P./ 200-2.29.1 and 2.29.3.

You should know that under the Sunshine Laws this hearing will be public except where character and good name is to be discussed. If you want a hearing you should notify the Town Attorney, Robert H. Brogden, in writing that you are requesting a hearing. If the date of the tentative hearing I have set is not available for you or your attorney, you should notify Mr. Brogden immediately so that another hearing can be set. If you do not request a hearing in writing to Robert H. Brogden, the attorney for the Town, it will be presumed that you do not want a hearing and your employment will be terminated.

This the 25th day of March, 2005.

W. Dexter Hammond, Chief of Police
of The Town of Midland City, Alabama

**TO: DION ROBINSON**



DEFENDANT'S
EXHIBIT
5

# AMENDED NOTICE

This is to inform you that the Notice dated March 25, 2005, is hereby amended as set out herein and also additional specification of charges are set out herein as follows:

13. You gave marijuana and paraphernalia to Kathy Wheeler, Keisha Davis and Tracy Taylor. This was drugs that you had gotten from Midland City's evidence locker or drugs you had confiscated. This action is criminal and cannot be tolerated. Further, this is in violation of S.O.P. 2.29.2.

14. You had a sexual relationship with Keisha Davis, Kathy Wheeler and Tracy Taylor. This relationship was carried out while you were on duty and even while you were on the Town's patrol car. You had sexual relations in the Town's patrol car. Further, you started a sexual relationship with Keisha Davis when she was 17 years of age. During all of this time you were married. This violates S.O.P. 2.29.2 and also having sexual relations with a 17 year old could be considered contributing to the delinquency of a minor, which is criminal conduct.

15. You gave cigarettes and alcohol to Keisha Davis, Kathy Wheeler and Tracy Taylor that you took from people on roadblocks. This violates S.O.P. 2.29.2 and is also considered to be possible violations of the criminal law.

16. You asked Kathy Wheeler to allow you to sell some controlled substances that she had legally and told her you could get $20.00 a pill and that you and her would divide the profits. This violates S.O.P. 2.29.2 and is also a possible violation of the criminal laws.

17. While on duty you picked up Kathy Wheeler (while you were having an improper relationship with her) at a club in Dothan, Alabama, on the Town's patrol car and took her home because she had contacted you and said she was too intoxicated to drive. This violates S.O.P. 2.29.2.

18. You have consumed alcohol while on duty, in uniform, and were driving a Midland City patrol car. This violates S.O.P. 2.29.2 and S.O.P. 2.6. In addition, it is a possible violation of the criminal laws.

This is to inform you that I am proposing to terminate your employment with The Town of Midland City, Alabama. You have the right to a hearing before the Town Council if you notify me in writing within five (5) days from the date you receive this Notice. If I do not receive the written notification of your request for a hearing within five (5) days, you will be terminated effective on the 6th day after you receive this notification. If you request a hearing a special time will be set for the hearing before the Town Council.

All of the things you were told in the Notice dated March 25, 2004, still apply unless they are in conflict with this Notice. I will not sit in decision of this matter because myself and the Chief of Police are the persons bringing these charges.

DONE this _____ 8 _____ day of June, 2005.


Don Parker, Mayor
of The Town of Midland City, Alabama

I, Don Parker, Mayor of the Town  of Midland City, Alabama, have hand delivered the above Amended Notice to Dion Robinson on the _____5_____ day of June, 2005, at _2:45_ o'clock, _P__.m.

Don Parker, Mayor
of The Town of Midland City, Alabama

  *Midland City* **Police Department**

P. O. BOX 69 • MIDLAND CITY, AL 36350
BUSINESS (334) 983-5211 • EMERGENCY (334) 983-1944 • FAX (334) 983-3514

**Dexter Hammond**
Chief

**Don Parker**
Mayor

# MEMORANDUM

> **DEFENDANT'S EXHIBIT**
> 3

**FROM**      :      Police Chief W. Dexter Hammond

**TO**      :      Police Sergeant Dion Robinson

**DATE**      :      March 1, 2005

**SUBJECT**      :      **ADMINISTRATIVE LEAVE**

As voted on by the Town Council and Mayor of the Town of Midland City; Effective **March 1, 2005** at **1900**, you are hereby placed on Administrative Leave (with pay) pending the outcome of the recent investigation being conducted by The Alabama Bureau of Investigation. During this leave period, you are to refrain from representing yourself as a Midland City Law Enforcement Officer and will be required to surrender the following items to the Chief of Police within 24 hours of receipt of this notice.

> **EQUIPMENT LIST**
> **Police Department Issued Weapons** ~~~~ *Did not Issue.*
> **Police Department Issued Badge** ✓
> **Police Department Assigned Vehicle** ✓
> **Police Department Issued Keys** ✓
> **Police Department Issued Identification Cards** ✓

*Date received 3/3/05*
*made copy + given to Sgt.*
*Mattox*

W. Dexter Hammond
Chief of Police

cc: Personnel File

**DEFENDANT'S EXHIBIT**
4

## TO:  DION ROBINSON C/O NEVILLE REESE, ATTORNEY AT LAW

This is to inform you that I am proposing to terminate your employment with the Town of Midland City, Alabama, and/or suspend you, with or without pay, or demote you.  You have a right to have a hearing before the Mayor and Town Council.  The mayor and Town Council has the right to make the decision on whether or not your employment will be terminated or whether you will be suspended with or without pay, and/or demoted, or whether any action at all will be taken against you.  If you desire a hearing, one will be held at the Town Hall on the 31st day of March, 2005, at 5:00 p.m.  If you do not desire a hearing your employment will be terminated.  You have the right to be represented by legal counsel of your choosing.  The informal rules of administrative hearing will apply.  You have the right to have a court reporter or other recording method to record the entire proceedings, at your own expense.  You will be afforded an opportunity to present witnesses and the right to cross exam any witnesses.  All witnesses will testify under oath.

The specification of the charges to be brought before the Town Council are as follows:

1.  You received a letter of suspension from myself on March 1, 2005.  In that letter of suspension you were told not to represent yourself as a Midland City Police Officer.  Yet, you were at ball games at Dale County High School working security and wearing a badge and a weapon.  Also, we have been informed that you were representing yourself as a Napier Field Policeman.  This would be in violation of S.O.P. 2.29.15, working off-duty, police related assignments without authorization, and would also be in violation of S.O.P.

2.17, working for another agency or jurisdiction without written approval from the Chief of Police.

2. On January 20, 2005, drugs were found in a police department cabinet with no lock on it. You had put the drugs in there in a Crown Royal bag. When I counseled you about the proper way to secure evidence you got upset and insubordinate. Midland City has an evidence locker and proper procedures which you failed to follow. This amounts to incompetence in violation of S.O.P. 200-2.29.1 and insubordination under S.O.P. 200-1.11.

3. On March 21, 2005, when inventorying weapons collected by you I found that on the Wilbert Jackson Case #04120156, there were two weapons taken but only the handgun was listed on the report. The 20 gauge shotgun was not logged on the report at all, but was tagged with the same case number. Also, you tagged another handgun on January 11, 2005, Case #05010131, but no property sheet was ever filled out. This is incompetence under S.O.P.200-2.29.1.

4. On February 1, 2005, you were written up for making a $751.90 order (hand sanitizers) to Royal Chemical, Inc. without my permission. You did not have authority to make the order. This order was placed by you on December 22, 2004. When I talked with you on February 1, 2005, you told me two different stories about the order.

*First:*    Was that the ex-chief ordered the hand sanitizers every year and he must have had the police department on an automatic shipment and billing system.

*Second:*   Was that you ordered the items on in November, 2004, before I became chief.

You acted without authority to place this order and then you were untruthful. This untruthfulness is in violation of S.O.P. 200-2.29.2 and 2.29.3.

5.   On March 8, 2005, it was reported to me that you made a traffic stop with reference a Frank Brown. (This traffic stop was previous to the date of March 8, 2005). This Frank Brown made a verbal complaint about 11 DVD's (porn) being taken from him on a traffic stop. There was no offense report nor were the items tagged or an evidence property sheet filled out. I found the DVD's in the police department. The items should not have been taken since they were not illegal. On March 16, 2005, the items were released back to Mr. Brown. This would violate the procedures for keeping evidence and violates S.O.P. 200-2.29.1 on incompetence since these items should have never been taken on a traffic stop.

6.   On March 16, 2005, I went to release a weapon (hand gun) back to James Frank by order of Judge Matthews. You had put the weapon in the administrative office. You had also put three more handguns and one shotgun in the office and were all tagged, but the one handgun and the shotgun had no property evidence sheet with the items. This violates the chain of custody and is incompetence under S.O.P. 200-2.29.1

7.   On February 13, 2005, I received a complaint from Ann at the Red Owl Restaurant with reference you. Ann stated that you came in the restaurant while you were on duty with the ex-employee at or around noontime when

the restaurant was packed with customers. The ex-employee was there to try and collect money that she claimed was owed to her. The people at the Red Owl Restaurant were upset at a police officer being there and that this was not a police matter. It is not proper for a police officer to get involved in a civil matter. This is incompetence under S.O.P. 200-2.29.1.

8. 8. On February 16, 2005, I attempted to talk with you about your work performance as a police officer. Your response was that you wouldn't talk to me about it. You became very upset and refused to talk with me. This was insubordination under S.O.P. 200-1.11.

9. On February 25, 2005, I was out of town and I checked in with the Town. I was informed that on that date you were in the process of a UTC to a driver (Kevin Lamberth) by having an expired driver's license. I asked the dispatcher for the expiration date on the driver's license and she stated that it was January 5, 2005. The ticket should have never been issued since by law there is a 60 day grace period. This is incompetence under S.O.P. 200-2.29.1.

10. On March 9, 2005, the manager of Wings and Things came to the police department to complain about an attempted burglary at his store that had happened at approximately 3:38 a.m. on February 23rd or 24th of 2005. He stated that you had come out and found the alarm wires cut. You did not file a report nor did you tell C.I.D. or notify anybody. This is incompetence under S.O.P. 200-2.29.1.

11. On March 16, 2005, a person named Creel wanted to talk with me. He told me he was arrested in August, 2004, for D.U.I, but not put in jail. He tested a

.07 on the Drager. Mr. Creel stated that you took him from Midland City and left him at the Toy Box in Newton. You never took him to jail. This is in violation of all procedures and could have placed the Town in jeopardy if this individual had gotten in an accident. This is in violation of S.O.P. 200-2.29.1 on incompetence and also S.O.P. 200-2.9 on transporting prisoners to the proper facility.

12. Sometime around the 4th of July holiday of 2004, an incident occurred with one, Maurice Rumph, who is a known local drug dealer. When questioned about this by me you told me that you were at a car wash when this individual came up and gave you a high five and left a $100.00 bill in your hand. You stated that you threw it back at him and said, "What is this for". When you were questioned about this by the A.B.I. you told them you kept the money for a short time and then went to the individual's apartment and gave the money back to him. One of these two stories is untrue. Also, this type of conduct is intolerable. This will also violate S.O.P./ 200-2.29.1 and 2.29.3.

You should know that under the Sunshine Laws this hearing will be public except where character and good name is to be discussed. If you want a hearing you should notify the Town Attorney, Robert H. Brogden, in writing that you are requesting a hearing. If the date of the tentative hearing I have set is not available for you or your attorney, you should notify Mr. Brogden immediately so that another hearing can be set. If you do not request a hearing in writing to Robert H. Brogden, the attorney for the Town, it will be presumed that you do not want a hearing and your employment will be terminated.

This the 25th day of March, 2005.

W. Dexter Hammond, Chief of Police
of The Town of Midland City, Alabama



DEFENDANT'S EXHIBIT
5

**TO: DION ROBINSON**

## AMENDED NOTICE

This is to inform you that the Notice dated March 25, 2005, is hereby amended as set out herein and also additional specification of charges are set out herein as follows:

13. You gave marijuana and paraphernalia to Kathy Wheeler, Keisha Davis and Tracy Taylor. This was drugs that you had gotten from Midland City's evidence locker or drugs you had confiscated. This action is criminal and cannot be tolerated. Further, this is in violation of S.O.P. 2.29.2.

14. You had a sexual relationship with Keisha Davis, Kathy Wheeler and Tracy Taylor. This relationship was carried out while you were on duty and even while you were on the Town's patrol car. You had sexual relations in the Town's patrol car. Further, you started a sexual relationship with Keisha Davis when she was 17 years of age. During all of this time you were married. This violates S.O.P. 2.29.2 and also having sexual relations with a 17 year old could be considered contributing to the delinquency of a minor, which is criminal conduct.

15. You gave cigarettes and alcohol to Keisha Davis, Kathy Wheeler and Tracy Taylor that you took from people on roadblocks. This violates S.O.P. 2.29.2 and is also considered to be possible violations of the criminal law.

16. You asked Kathy Wheeler to allow you to sell some controlled substances that she had legally and told her you could get $20.00 a pill and that you and her would divide the profits. This violates S.O.P. 2.29.2 and is also a possible violation of the criminal laws.

17. While on duty you picked up Kathy Wheeler (while you were having an improper relationship with her) at a club in Dothan, Alabama, on the Town's patrol car and took her home because she had contacted you and said she was too intoxicated to drive. This violates S.O.P. 2.29.2.

18. You have consumed alcohol while on duty, in uniform, and were driving a Midland City patrol car. This violates S.O.P. 2.29.2 and S.O.P. 2.6. In addition, it is a possible violation of the criminal laws.

This is to inform you that I am proposing to terminate your employment with The Town of Midland City, Alabama. You have the right to a hearing before the Town Council if you notify me in writing within five (5) days from the date you receive this Notice. If I do not receive the written notification of your request for a hearing within five (5) days, you will be terminated effective on the 6th day after you receive this notification. If you request a hearing a special time will be set for the hearing before the Town Council.

All of the things you were told in the Notice dated March 25, 2004, still apply unless they are in conflict with this Notice. I will not sit in decision of this matter because myself and the Chief of Police are the persons bringing these charges.

DONE this _____ 8 _____ day of June, 2005.

Don Parker, Mayor
of The Town of Midland City, Alabama

I, Don Parker, Mayor of the Town of Midland City, Alabama, have hand delivered the above Amended Notice to Dion Robinson on the _____ day of June, 2005, at _____ o'clock, ___.m.

Don Parker, Mayor
of The Town of Midland City, Alabama

  *Midland City*    *Police Department*

P. O. BOX 69 • MIDLAND CITY, AL 36350
BUSINESS (334) 983-5211 • EMERGENCY (334) 983-1944 • FAX (334) 983-3514

**Dexter Hammond**
Chief

**Don Parker**
Mayor

RECEIVED 3/18/2005 @ 1845


**DEFENDANT'S
EXHIBIT
6**

March 18, 2005

Sgt. Dion Robinson:

This letter is to inform you that I have requested an Administrative Disciplinary hearing with the mayor and Council to determine your further employment status with the Midland City Police Department. The Charges lodge against you will as follows from your departments Policy and Procedures (SOP); # 200

- 2.29 - Incompetence in the performance of your duties.

- 2.29.15. - Conduct unbecoming of an officer.

- 2.9 – The Safeguarding of prisoners

- 2.29.14 - Chain of Command

- 2.17 – Police Commissions

The meeting will take place on Wednesday March 30, 2005 at City Hall. You may choose to be there at 5:00 pm to argue your case.

Sincerely,

Dexter Hammond
Chief Of Police

CC:

Mayor office
Town Clerk
Town Council